UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEBORA L. GILLETTE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 1:16-cv-03384-DML-JMS ) |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security, Administration, | ) ) ) ) ) |
| Defendant. | ) |

# Decision on Complaint for Judicial Review

Plaintiff Debora L. Gillette applied in September 2013 for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, alleging that she has been disabled since September 2, 2007. Acting for the Commissioner of the Social Security Administration following a hearing held October 5, 2015, administrative law judge John H. Metz issued a decision on October 20, 2015, finding that Ms. Gillette was not disabled before her date last insured (December 31, 2012) under the DIB program. The Appeals Council denied review of the ALJ's decision on October 21, 2016, rendering the ALJ's decision for the Commissioner final. Ms. Gillette timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision. The parties consented to the magistrate judge conducting all proceedings and ordering the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Ms. Gillette contends the Commissioner's decision must be reversed and remanded because (1) the residual functional capacity ("RFC") finding is not based on substantial evidence and (2) the vocational expert's opinion was not consistent with the Dictionary of Occupational Titles, and the ALJ failed properly to inquire about and address those inconsistencies.

The court will first describe the legal framework for analyzing disability claims and the court's standard of review, and then address Ms. Gillette's specific assertions of error.

## **Standard for Proving Disability**

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Ms. Gillette is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled. Step two asks whether the claimant's

impairments, singly or in combination, are severe; if they are not, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her age, work experience, and education (which are not considered at step four), and her RFC; if so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work

3

exists in significant numbers in the national economy that the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

### I. The ALJ's Sequential Findings

Ms. Gillette was born in 1959 and was 48 years old at the alleged onset of her disability in September 2007. Ms. Gillette's date last insured for purposes of the

DIB program is December 31, 2012; thus, to receive benefits, she must have become disabled on or before that date. *Shideler v. Astrue,* 688 F.3d 306, 311 (7th Cir. 2012) (claimant must establish that disabled before expiration of her insured status).

Ms. Gillette's most recent job before she stopped working in 2007 was as a certified nursing assistant between 1999 and 2007. She stopped working because of a knee injury. (R. 42-44).

At step one, the ALJ found that Ms. Gillette had not worked since her alleged onset date. At steps two and three, the ALJ found that through the date last injured, Ms. Gillette had severe impairments of bilateral knee impairments, back pain, asthma/COPD, hearing loss, high blood pressure, diabetes, and obesity, but that no listing was met or medically equaled. Ms. Gillette does not challenge the ALJ's steps one through three findings.

For the RFC before the date last insured, the ALJ relied on the hearing testimony of a medical expert (Dr. John A. Pella) and found that before her date last insured, Ms. Gillette was capable of a limited range of light work, as follows:

- lifting and carrying 20 pounds occasionally and 10 pounds frequently
- sitting for two hours at a time and six hours in an 8-hour work day
- standing for 30-60 minutes at a time and for three hours in a work day
- walking for 30 minutes at a time and for two-three hours in a work day
- pushing and pulling bilaterally on a frequent basis
- using the left lower extremity only occasionally and no such restrictions for the right leg

5

- using stairs with a handrail but no climbing of ladders or scaffolds
- only occasionally balancing, stooping, and kneeling
- avoiding unprotected heights and commercial driving
- tolerating humidity and wetness only occasionally and no concentrated exposure to fumes, dusts, irritants, extreme heat, or extreme cold
- no more than a moderate (office level) exposure to noise

With the RFC and based on the testimony of a vocational expert, the ALJ decided that before her date last insured, Ms. Gillette could not perform her past relevant work, but that she was capable of the following work, available in significant numbers in the economy: (1) receptionist, information clerk (DOT #237.367-018) (1,600 positions in Indiana); (2) attendant (DOT #324.577-010) (288 positions in Indiana), and (3) counter person (DOT #249.366-010) (3,015 positions in Indiana). Accordingly, the ALJ decided at step five that Ms. Gillette was not disabled before her date last insured of December 31, 2012.

## II. <u>Ms. Gillette Assertions of Error</u>

Ms. Gillette raises two errors. First, she contends that the RFC is not supported by substantial evidence because it allegedly did not "include sufficient exertional limitations." Second, she contends that the VE's opinion testimony is not reliable and does not provide a sufficient foundation for the ALJ's step five decision. On the latter point, she makes two main arguments: (1) the ALJ did not provide the VE with sufficient information regarding her hearing impairment to ensure that she was capable of performing the jobs about which the VE testified; and (2) the

6

ALJ did not adequately address or resolve inconsistencies between the Dictionary of Occupational Titles and the jobs information provided by the vocational expert. The court will address these issues in turn below.

III. **The ALJ relied on Dr. Pella's hearing testimony in formulating the RFC.**

The ALJ relied primarily on the hearing testimony of medical expert physician John Pella in fashioning an appropriate RFC. Dr. Pella reviewed and discussed the evidence and gave his opinion about Ms. Gillette's residual functional capacity between her alleged onset date and her date last insured.

Ms. Gillette contends that the ALJ should have used in the RFC the limitations in standing and walking and lifting capabilities that Ms. Gillette described to the consultative examiner in June 2012 instead of relying on Dr. Pella's opinion. The court rejects this argument. There is no showing that Dr. Pella was insufficiently expert in evaluating all of the medical information in the file, including Ms. Gillette's descriptions to the consultative examiner and her administrative hearing testimony, to opine about both the severity of Ms. Gillette's impairments and their effect on her functioning. The court's function is not to reweigh evidence, and Dr. Pella's testimony about Ms. Gillette's standing/walking and lifting capabilities (and other physical capabilities) as of her date last insured provides substantial evidence for the ALJ's decision to adopt those findings in his RFC.

## IV. The ALJ did not orient the VE regarding the extent of Ms. Gillette's hearing loss.

When, at step five, an ALJ relies on the testimony of a vocational expert regarding jobs that fit particular functional abilities and provide a certain work environment, the claimant must of course actually have that functional capacity and the ability to function in the described environment. *E.g., Jelinek v. Astrue,* 662 F.3d 805, 813 (7th Cir. 2011) ("We have stated repeatedly that ALJs must provide vocational experts with a complete picture of a claimant's residual functional capacity. . . .") There must be some assurance that the VE's testimony regarding available jobs took into account all functional limitations stemming from impairments the ALJ has found and that are otherwise supported by the evidence. *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002). Otherwise, one cannot be assured that the VE's opinion includes only jobs that the claimant can perform. *Id.* As explained in *Steele*:

> The reason for the rule [that hypothetical questions to the VE must include all limitations supported by the evidence] is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations.

*Id.*

Ms. Gillette argues that this principle was violated because the ALJ did not orient the VE about Ms. Gillette's hearing problems. Dr. Pella testified that before her date last insured, Ms. Gillette "was apparently deaf in the left ear related to a type of benign tumor" and had "some decreased hearing on the right." He noted that "conversational hearing was said to be maintained." (R. 57). Consistent with

8

the medical evidence, the ALJ decided that Ms. Gillette suffered from the severe impairment of "hearing loss." (R. 15). Dr. Pella stated that a work limitation because of hearing loss should include a limit of "noise to moderate, that is an office level exposure only." (R. 60). The ALJ included that limitation in his hypothetical to the VE. The ALJ did not, however, include in his hypothetical more specific information about Ms. Gillette's hearing capability, including that she was deaf in one ear and had some decreased hearing in the other.

When Ms. Gillette's counsel asked the VE about the "hearing" requirements for the three jobs he opined a person could do consistent with the RFC described by the ALJ in his hypothetical, the VE was not able to answer the question. The VE described the "noise intensity" environmental level for the three jobs but he did not address (and did not seem to know) that the Department of Labor's Selected Characteristics of Occupations (the companion to the Dictionary of Occupational Titles) also classifies each job in the domain of hearing—a factor different from noise intensity level.[1] The ALJ's statement in his decision that the VE had explained that the three jobs he described would accommodate Ms. Gillette's

---

[1] The Selected Characteristics of Occupations (SCO) classifies each job described in the DOT with respect to its strength level (sedentary, light, medium, heavy, very heavy), with respect to 19 physical demand factors such as "hearing," climbing, and others (and notes whether each physical demand must be performed occasionally, frequently, constantly, or not at all), and with respect to 14 environmental conditions. Noise intensity level is one of the 14 environmental conditions. A job rated as "3" is "moderate" in noise intensity. The SCO's examples of a moderate noise intensity level environment are "business office where typewriters are used; department store; grocery store; light traffic; fast food restaurant at off-hours." The other noise intensity levels are 1 (very quiet), 2 (quiet), 4 (loud), and 5 (very loud).

9

hearing loss (R. 26) cannot be squared with the evidence that the VE did not consider the "hearing" requirements for any of those jobs. This raises the real possibility that the VE referred to jobs that Ms. Gillette cannot actually perform.

In his decision, the ALJ suggested it was not necessary to more specifically address Ms. Gillette's hearing loss in his hypothetical to the VE because Ms. Gillette was able to hear and answer questions during the administrative hearing, she had worked in the past even though she had hearing loss then, and in interviews with Agency employees, they observed that she did not have problems understanding them. (R. 23-24). But the ALJ did not compare these environments (a court-type hearing, one-on-one interviews, and Ms. Gillette's past work) or the level of sustained hearing demands in these environments to any of the jobs described by the VE. The issue is whether a person who is deaf in one ear and has hearing loss in the other (which Dr. Pella stated was supported by the record) can meet the physical demands of the jobs the ALJ decided Ms. Gillette can perform. That issue was not addressed by the VE's expert testimony.

## V. **Ms. Gillette contends the jobs do not fit her RFC.**

Ms. Gillette asserts other arguments regarding the alleged unreliability of the VE's testimony. She contends that the manner in which the VE calculated the numbers of jobs available for each of the three positions he addressed is unreliable. She also contends that the three jobs do not actually fit the ALJ's RFC and that the ALJ did not resolve those discrepancies. The court is persuaded that the disconnect between the three jobs the ALJ decided Ms. Gillette can perform and Ms. Gillette's

10

RFC and the ALJ's failure to address the discrepancies means that the step five decision is not supported by substantial evidence. The Commissioner's decision must be reversed on that basis.

Under Social Security Ruling 00-4p, if a VE's testimony appears to conflict with the DOT, then the ALJ is required to obtain "a reasonable explanation for the apparent conflict." *See Overman v. Astrue,* 546 F.3d 456, 463 (7th Cir. 2008) (citing *Prochaska v. Barnhart,* 454 F.3d 731, 735 (7th Cir. 2006)). As explained below, there are apparent conflicts between the VE's testimony and the DOT with respect to each job, and no reasonable explanation for the apparent conflict was offered or cited by the ALJ in his decision. The ALJ did not, in his decision, address any of the apparent conflicts (even though they were raised during the hearing) and did not provide a reasoned explanation why the VE's testimony was nonetheless reliable. Instead, the ALJ determined, without tracing his reasoning, that the expert's testimony is, in fact, "consistent with the information contained in the Dictionary of Occupational Titles." (R. 26).

The court highlights below ways in which the three jobs the ALJ concluded Ms. Gillette could have performed as of her date last insured are inconsistent on their face with the DOT. The three jobs are: (1) Information Clerk (DOT #237.367-018); (2) Room-Service Clerk (DOT #324.577-010); and (3) Counter Clerk (DOT #249.366-010).

### A. Information Clerk

The job of Information Clerk is described in the DOT as follows:

CODE: **237.367-018**
TITLE(s): **INFORMATION CLERK (motor trans.; r.r. trans.; water trans.) alternate titles: travel**
clerk Provides travel information for bus or train patrons: Answers inquiries regarding departures, arrivals, stops, and destinations of scheduled buses or trains. Describes routes, services, and accommodations available. Furnishes patrons with timetables and travel literature. Computes and quotes rates for interline trips, group tours, and special discounts for children and military personnel, using rate tables.
**GOE: 07.04.04 STRENGTH: L GED: R4 M2 L3 SVP: 2 DLU: 77**

In his decision, the ALJ identified this job as "Receptionist, Information Clerk" under DOT 237.367-018. As Ms. Gillette points out, the DOT classifies "receptionist" and "information clerk" as two separate jobs, and the "receptionist" job (DOT 237.367-038) is a sedentary, semi-skilled job. The ALJ did not find that Ms. Gillette is capable of semi-skilled work. Indeed, he found that Ms. Gillette's skills from past work did not transfer to other occupations within her RFC (R. 25), which means that Ms. Gillette must have been treated as unskilled according to SSA's own regulations. *See* 20 C.F.R. § 404.1565 ("If you have acquired skills through your past work, we consider you to have these work skills unless you cannot use them in other skilled or semi-skilled work that you can now do. If you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled.") Because the VE's jobs numbers for "receptionist, information clerk" apparently included jobs for the receptionist

position and Ms. Gillette cannot perform that job, the court cannot find that the Commissioner met her burden with respect to this job at step five.

Moreover, as may be surmised by the DOT's description of the Information Clerk position, the job requires "constant" (meaning throughout the entire workday) talking and hearing as described by the SCO. As noted in Section IV, there is a lack of substantial evidence that Ms. Gillette's hearing loss is compatible with the demands of a job requiring constant "hearing."

### B. Room-Service Clerk

The job of Room-Service Clerk is described in the DOT as follows:

CODE: **324.577-010**
TITLE(s): **ROOM-SERVICE CLERK (hotel & rest.) alternate titles: delivery-room clerk; package clerk;**

receiving-room clerk; runner Performs any combination of following tasks related to serving guests in apartment hotels: Delivers and removes packages, laundry, clothes, groceries, and other articles to and from guests rooms or servidors (cabinets built into doors of hotel rooms). Collects supply orders from various departments and delivers to PURCHASING AGENT (profess. & kin.). Delivers mail to various departments and guests. Records information pertaining to services rendered. May arrange for pressing clothes and shining shoes, sending and receiving packages, and in maintaining valet service. May press clothes and shine shoes [SHOE SHINER (personal ser.)]. May supervise activities of workers engaged in delivering packages to hotel guests.
**GOE: 09.05.03 STRENGTH: L GED: R2 M2 L2 SVP: 2 DLU: 77**

As Ms. Gillette points out, the VE described this job as an "attendant" position and stated that it could encompass a room-service clerk (the job title of the DOT number listed in the ALJ's decision) or two other possible jobs: a checkroom attendant or a linen-room attendant. The latter jobs have their own DOT numbers that were not mentioned by the VE and at least one of them (linen-room attendant,

DOT #222.387-030) is performed at a higher strength (medium) than Ms. Gillette's RFC permits. Thus, again, the VE's jobs numbers for this position apparently included jobs Ms. Gillette cannot perform and the court therefore cannot find that the Commissioner met her burden with respect to this job at step five.

In addition, the Room Service Clerk job that the ALJ found Ms. Gillette could perform is described in the DOT as a "delivery" and "runner" job. The ALJ's RFC limits Ms. Gillette to walking only up to two to three hours in a workday (and only 30 minutes at a time), and there is no logical explanation how this job could be performed by such a person. The VE's suggestion that the job could accommodate such a person because the person just would not be busy ("they wouldn't have to do anything until somebody is asking for service" (R. 77)) is not a logical explanation. There is a clear inconsistency between this job and the RFC.

### C. Counter Clerk

The job of Counter Clerk, adopted as an appropriate job by the ALJ, is described in the DOT as follows:

CODE: **249.366-010**
TITLE(s): **COUNTER CLERK (photofinishing)**

Receives film for processing, loads film into equipment that automatically processes film for subsequent photo printing, and collects payment from customers of photofinishing establishment: Answers customer's questions regarding prices and services. Receives film to be processed from customer and enters identification data and printing instructions on service log and customer order envelope. Loads film into equipment that automatically processes film, and routes processed film for subsequent photo printing. Files processed film and photographic prints according to customer's name. Locates processed film and prints for customer. Totals charges, using cash register, collects payment, and returns prints and processed film to customer. Sells photo supplies, such as film, batteries, and flashcubes.

14

**GOE: 07.03.01 STRENGTH: L GED: R2 M2 L2 SVP: 2 DLU: 86**

When the VE was asked how this light job (light jobs generally require the ability to stand or walk up to six hours per day) could be classified to fit the minimal standing and walking abilities described in the RFC, he said that it's light work because of the 20 pounds or more weight that needs to be lifted or carried to perform the job and not because it requires more than the two to three hours of standing or walking. But the DOT's description does not include the handling of anything heavy; it requires handling camera film and photographs and working a cash register. When the VE was pressed further on how a "counter" person is not required to stand at her counter more than the minimal standing abilities in the RFC, the VE's explanation was that in his observations of persons who perform these jobs, "it's usually not that busy." (R. 76) He agreed that if the job is busy—if there are customers who want help—then walking or standing is required. The explanation that Ms. Gillette could do the job because it probably will not be busy is not sufficient to bridge the gap between the obvious discrepancy between the DOT and Ms. Gillette's RFC.

By simply accepting the VE's testimony without sufficient explanation, despite the apparent disconnect between the RFC and the three jobs the ALJ determined Ms. Gillette could perform, the Commissioner's step five finding that Ms. Gillette was not disabled as of her date last insured must be rejected by the court as without substantial evidentiary support.

## Conclusion

For the foregoing reasons, the court REVERSES AND REMANDS under sentence four of 42 U.S.C. § 405(g) the Commissioner's decision that Ms. Gillette ws not disabled before her date last insured.

So ORDERED.

Dated: March 22, 2018

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system